**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| TARSIA MADDOX, | * | |
| Plaintiff, | * | |
| v. | * | |
| | * | Civil No. 25-4200-BAH |
| BALTIMORE POLICE DEPARTMENT ET AL., | * | |
| Defendants. | * | |

* * * * * * * * * * * * * *

## MEMORANDUM OPINION

Plaintiff Tarsia Maddox ("Maddox" or "Plaintiff") brought suit against the Baltimore Police Department ("BPD"), Wendy Morton ("Morton"), and Consuelo Laws ("Laws") (collectively "Defendants"), asserting claims under the First and Fourteenth Amendments to the United States Constitution, the Maryland Constitution, and Maryland common law. ECF 1.

Pending before the Court are two motions. First, BPD filed a motion to dismiss, ECF 24, to which Plaintiff responded, ECF 26, and BPD replied, ECF 29. Second, Morton filed a motion to dismiss, ECF 43, to which Plaintiff responded, ECF 44, and Morton replied, ECF 45. All filings include a memorandum of law.[1] The Court has reviewed all relevant filings and finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2025). Accordingly, for the reasons stated below, BPD's motion to dismiss, ECF 24, is **GRANTED** with respect to Plaintiff's federal claims, and

[1] The Court references all filings by their respective ECF numbers and page numbers by the ECF-generated page numbers at the top of the page.

Morton's motion to dismiss, ECF 43, is **GRANTED** with respect to Plaintiff's federal claims. The remaining state law claims will be **DISMISSED** without prejudice.

# I. BACKGROUND

## A. Factual Allegations[2]

This case concerns alleged retaliation and harassment against Plaintiff Tarsia Maddox, "an African American woman and a veteran police officer who has served with the [BPD] since approximately August 2015." ECF 1, at 3 ¶ 6. There are three co-defendants. BPD is a municipal police agency that "Maryland law has at times characterized . . . as a state agency, [but that] operates as a municipal police force." *Id.* ¶ 7. Wendy Morton was, at all times relevant to the complaint, a BPD detective assigned to BPD's Public Integrity Bureau ("PIB"), which is responsible for investigating allegations of misconduct by BPD members. *Id.* at 4 ¶ 8. Consuelo Laws is a private individual and Maryland resident who Plaintiff alleges is a "close acquaintance of Detective Morton and other BPD members" and who allegedly conspired with Morton to target and harass Plaintiff.[3] *Id.* ¶ 9.

### 1. Background on BPD Internal Affairs

In 2017, BPD entered into a Consent Decree with the United States Department of Justice and adopted reforms "improving internal accountability and protecting whistleblowers within

[2] The facts provided in this section are taken from the complaint and are assumed true for the purposes of the pending motion to dismiss. *See Leichling v. Honeywell Int'l, Inc.*, 842 F.3d 848, 850 n.1 (4th Cir. 2016) (citing *A Soc'y Without A Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011)).

[3] The clerk of court entered default against Laws on June 25, 2026. ECF 47. Plaintiff has not yet moved for default judgment against Laws. Because the Court finds that Plaintiff has failed to state a claim on all federal claims and there are no claims brought solely against Laws, all federal claims against Laws will also be dismissed and the state law claims against Laws will be dismissed without prejudice.

BPD." *Id.* at 5 ¶ 12. As part of those reforms, the PIB "adopted an Internal Operations and Training Manual ("PIB Manual") to govern internal misconduct investigations, mandating strict confidentiality and integrity in the process." *Id.* The PIB Manual "explicitly prohibits PIB personnel from disclosing or confirming to anyone outside of PIB that a complaint has been made, that an investigation is underway, or the identities of complainants, witnesses, or [the] accused." *Id.* Even after these reforms, however, an investigation conducted from 2018 to 2020 found that over half of BPD officers who reported misconduct "felt they suffered negative consequences as a result, and many stated they would be unlikely to report misconduct again due to fear of further retaliation and career sabotage." *Id.* at 6 ¶ 13.

2. Harassment of Maddox

In April 2023, Maddox began experiencing what she alleges was "an orchestrated harassment and retaliation campaign led by Detective Morton and Consuelo Laws."[4] *Id.* ¶ 14. From May 2023 to March 2024, "at least four anonymous internal affairs complaints were lodged against Plaintiff." *Id.* at 7 ¶ 15. Plaintiff alleges that each complaint was baseless, and further claims that they were initiated by "Laws in conjunction with Detective Morton using Morton's insider knowledge and access to restricted information." *Id.* The four complaints include: a May 11, 2023, complaint alleging that Plaintiff had an improper relationship with a superior officer; a June 7, 2023, complaint accusing Plaintiff of "conduct unbecoming" and "computer misuse"; a November 29, 2023, complaint alleging "unspecified conduct unbecoming and . . . scandalous, patently false statements suggesting Plaintiff had an improper relationship with a colleague"; and a March 5, 2024, complaint alleging that Plaintiff was "intoxicated or under the influence of

[4] While Plaintiff initially appears to allege that she began experiencing the harassment and retaliation campaign in April 2023, the complaint later clarifies that the alleged retaliation itself began in response to a complaint Plaintiff filed in March 2024. *See* ECF 1, at 16 ¶¶ 42–43.

CBD/marijuana while at work." *Id.* With respect to the first, third, and fourth complaints, Plaintiff alleges that BPD delayed and "dragged out" the investigations and forced Plaintiff to submit to repeated drug testing. *Id.* Despite each complaint being "devoid of factual basis and . . . made for the malicious purpose of harassment and harm to Plaintiff's standing in the department," BPD nonetheless "treated each complaint as serious on its face, initiating formal internal investigations that scrutinized Plaintiff's conduct while Plaintiff's own complaints were ignored." *Id.* at 8 ¶ 16.

As part of the alleged harassment, Plaintiff and her husband also received various anonymous harassing phone calls and text messages. On April 15, 2023, Plaintiff "received an anonymous phone call during which the caller said nothing identifiable but later sent Plaintiff a photograph of Plaintiff, stolen from her personal social media account, with derogatory and insulting captions attached." *Id.* ¶ 17. "Shortly thereafter, Plaintiff's husband received a series of anonymous text messages that revealed confidential departmental information." *Id.* For example, one message listed the dates and times Plaintiff was supposed to appear for internal PIB interviews concerning the anonymous complaints of Plaintiff's alleged affairs with colleagues. *Id.* Plaintiff alleges that the "only way an outsider could know such details was by illicitly obtaining information from inside BPD," making it "clear that someone within BPD was leaking information to harass Plaintiff." *Id.*

Plaintiff continued to receive similar anonymous communications over the following weeks and months. *Id.* ¶ 18. The communications identified her by name and rank, referenced her internal affairs investigations, and, in a communication mailed to Plaintiff's home, "contained menacing taunts such as: 'I know people everywhere, everywhere within the department, including internal affairs and they will give me whatever I need about you!'" *Id.* Maddox's husband also continued to receive communications, allegedly from Laws, "spreading false accusations of

infidelity in an obvious attempt to poison Plaintiff's personal relationships and cause her emotional distress." *Id.* at 9 ¶ 18. The sender of the messages also said that they had sent copies of the messages alleging Plaintiff's infidelity to multiple people and wrote in the letter: "See you f[']ed around with the wrong one. You can hide behind that badge and act tough but at the end of the day I will win this one." *Id.* (altered to remove expletive).

Plaintiff provides several reasons for her contention that Laws was the source of the communications. First, Lieutenant Lamont Davis, with whom Plaintiff was accused of having an affair in one of the anonymous complaints, informed Plaintiff "that he was also being harassed and further stated that the source of the harassment was a woman named Consuelo Laws." *Id.* ¶ 19. Additionally, "[o]ther officers informed Plaintiff that Consuelo Laws was openly boasting about her close friendship with [Morton]," referring to "Morton as her 'ace in the hole' within BPD, [and] bragging that Morton could get her any information she wanted about BPD officers." *Id.* Further, as the harassment continued, the "anonymous text messages . . . became increasingly personal and threatening," and at times "utilized group text messages to defame the Plaintiff to her husband, her Lieutenant, and [the] Lieutenant's wife simultaneously." *Id.* at 12 ¶ 27. Plaintiff alleges these communications came from Laws because the harasser "demonstrated knowledge about the status and schedule of PIB's investigations into the Plaintiff which no civilian could legally have." *Id.*

3. <u>Maddox's Complaint Against Morton</u>

On March 18, 2024, Maddox "filed a formal, written complaint with PIB accusing Detective Morton of gross misconduct," alleging that Morton "had abused her position by accessing confidential internal records about Plaintiff and had unlawfully shared that private information with Ms. Laws, who was using it to harass Plaintiff." *Id.* at 10 ¶ 21. Plaintiff also

provided copies of the threatening messages, a chronology of events, and witnesses who could corroborate the harassment. *Id.* BPD's response was allegedly "woefully inadequate," as PIB did not launch a standard internal investigation but rather gave Morton an "informal interview" about the allegations that was "entirely outside of normal PIB protocol." *Id.* ¶ 22. Plaintiff contends that the "use of an off-the-record, informal inquiry suggested that BPD was trying to downplay or conceal the incident rather than investigate it properly." *Id.* BPD allowed Norton to remain in her PIB post for "months thereafter, with full access to sensitive information" and the ability to continue targeting Plaintiff "using her insider status." *Id.*

Eventually, "after many months," BPD "permitted Detective Morton to resign from the department 'with a penalty,' a phrasing that implies a minor administrative sanction without public disclosure of details." *Id.* at 11 ¶ 24. According to Plaintiff, "[b]y allowing Morton to quietly resign in lieu of facing criminal charges, formal discipline or a finding of misconduct, BPD avoided creating any official record that might vindicate Plaintiff's complaint or document their complicity." *Id.* In October 2024, "Morton quietly left BPD." *Id.* at 13 ¶ 33. Plaintiff alleges that around that time, "an internal audit or 'sweep' of BPD's computer systems was conducted, which uncovered evidence that Detective Morton improperly accessed Plaintiff's records without authorization." *Id.* On October 22, 2024, BPD Deputy Commissioner Brian Nadeau provided sworn deposition testimony in a then-pending case, "at which time he discussed a recent example of a detective within PIB accessing confidential information about fellow police officers without authorization."[5] *Id.* at 14 ¶ 34. Plaintiff alleges that Deputy Commissioner Nadeau was referring to Morton in that testimony. *Id.* However, BPD nonetheless "failed to provide the Plaintiff with

[5] The undersigned was the judge assigned to the case referenced by Plaintiff. *See Lilly v. Balt. Police Dep't*, Civ. No. BAH-22-2752, 2025 WL 1709856 (D. Md. June 17, 2025).

updates regarding her complaint about Detective Morton and never informed her of the fact that an internal sweep of Morton's computer was conducted nor the fact that it revealed she had accessed the Plaintiff's confidential files/information." *Id.* ¶ 35. Instead, Plaintiff alleges, "BPD and Deputy Commissioner Nadeau buried Plaintiff's complaint of serious misconduct and allowed Detective Morton to resign without announcing any formal findings about their investigation or her misconduct. *Id.* ¶ 36.

4. Retaliation Against Maddox

Following Maddox's initial complaint against Morton in March 2024, the harassment from Laws continued and "simultaneously, PIB redoubled its investigative scrutiny of Plaintiff stemming from the anonymous complaints." *Id.* at 11 ¶ 25. From March 2024 to July 2024, Plaintiff was "repeatedly summoned to PIB headquarters for interrogations and drug tests." *Id.* Additionally, PIB investigators "fanned out to question Plaintiff's fellow officers and even her superior officers . . . regarding the fictitious stories of sexual improprieties." *Id.* ¶ 26. Plaintiff views these actions as retaliation given the "disparity" in the PIB's approach to investigating the allegations against Plaintiff and investigating the allegations against Morton: BPD allegedly did not formally interview any of Morton's colleagues or scrutinize her communications, and "aggressively pursued vindictive investigations against the Plaintiff while failing to do anything regarding Plaintiff's allegations of misconduct within PIB." *Id.*

On August 23, 2024, Plaintiff's husband received an email from a PIB detective who was following up on an internal complaint against Plaintiff. *Id.* at 13 ¶ 32. Plaintiff's husband called the detective on a recorded line and stated that he wanted to file a formal complaint against Morton, but the detective refused to take the complaint and shared, "in sum and in substance, that PIB

would not be filing or pursuing any complaint against Detective Morton," which Plaintiff alleges is a violation of the PIB manual. *Id.*

5. Harm to Maddox

The alleged harassment and retaliation "took a profound toll on Plaintiff's well-being." *Id.* at 12 ¶ 29. Maddox felt isolated and stigmatized, and the "sustained whisper campaign and ongoing internal investigations nearly destroyed her standing within the department." *Id.* Her marriage was almost ruined, and her health deteriorated to the point that on July 19, 2024, she suffered a heart attack at work that has led to ongoing medical treatment and PTSD-like symptoms. *Id.* at ¶¶ 30–31. Despite each false PIB complaint eventually being closed with findings of "Not Sustained" or "Unfounded," *id.* at 15 ¶ 37, the damage to Maddox's reputation was already done and has "sabotaged any chance of promotion or specialty assignments," *id.* at 13 ¶ 31.

6. Claims

Plaintiff brings thirteen counts. Plaintiff brings the first three counts against all defendants under 42 U.S.C. § 1983 for retaliation in violation of the First Amendment (Count I); violation of the Fourteenth Amendment's Equal Protection Clause (Count II); and violation of the Fourteenth Amendment's Due Process Clause (Count III). ECF 1, at 16–23 ¶¶ 41–68. Plaintiff brings Count IV against Morton and Laws under 42 U.S.C. § 1985(3) for civil conspiracy to violate civil rights. *Id.* at 24–26 ¶¶ 69–77. Counts V–VII are brought against all defendants for violations of the Maryland Declaration of Rights Article 40, Free Expression (Count V); Article 24, Due Process and Equal Protection (Count VI); and Article 26, Unreasonable Search and Seizure (Count VII). *Id.* at 26–32 ¶¶ 78–101. Plaintiff also brings four counts against Morton and Laws under Maryland common law for defamation (Count VIII); invasion of privacy (Count IX); intentional infliction of emotional distress (Count X); and civil conspiracy (Count XII). *Id.* at 32–37 ¶¶ 102–26, at 39–

41 ¶¶ 135–41. Finally, Plaintiff brings two claims against BPD and Morton, one alleging negligence (Count XI) and one asserting a breach of fiduciary duty (Count XIII). *Id.* at 37–39 ¶¶ 127–134, at 41–42 ¶¶ 142–49. Plaintiff alleges federal question jurisdiction under 28 U.S.C. § 1331, jurisdiction under 28 U.S.C. § 1343(a), and supplemental jurisdiction under 28 U.S.C. § 1367. *Id.* at 5 ¶ 10.

### B. Procedural History

Plaintiff filed suit on December 19, 2025. ECF 1. BPD moved to dismiss this case on March 17, 2026. ECF 24. Plaintiff responded in opposition, ECF 26, and BPD replied, ECF 29. Separately, Morton filed a motion to dismiss on May 21, 2026, ECF 43, to which Plaintiff responded, ECF 44, and Morton replied, ECF 45. After Laws was served and failed to answer or otherwise respond, Plaintiff moved for the clerk's entry of default against Laws, ECF 46, and the clerk entered default against Laws on June 25, 2026, ECF 47. The two motions to dismiss are currently pending before the Court.

## II. <u>LEGAL STANDARD</u>

Federal Rule of Civil Procedure 12(b)(6) governs dismissals for failure to "state a claim upon which relief can be granted." In considering a motion under this rule, courts discount legal conclusions stated in the complaint and "accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A court then draws all reasonable inferences in favor of the plaintiff and considers whether the complaint states a plausible claim for relief on its face. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The

complaint must offer 'more than labels and conclusions' or 'a formulaic recitation of the elements of a cause of action[.]'" *Swaso v. Onslow Cnty. Bd. of Educ.*, 698 F. App'x 745, 747 (4th Cir. 2017) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). At the same time, a "complaint will not be dismissed as long as [it] provides sufficient detail about [the plaintiff's] claim to show that [the plaintiff] has a more-than-conceivable chance of success on the merits." *Owens v. Balt. City State's Att'ys Off.*, 767 F.3d 379, 396 (4th Cir. 2014).

## III. ANALYSIS

### A. First Amendment Retaliation (Count I)

The Fourth Circuit "applies a three-prong test to determine whether a public employee's First Amendment rights were violated under Section 1983, when the employee claims [adverse action] resulted from their protected speech." *Phillips v. Balt. Police Dep't*, Civ. No. GLR-25-1231, 2026 WL 220991, at *5 (D. Md. Jan. 28, 2026) (citing *McVey v. Stacy*, 157 F.3d 271, 277 (4th Cir. 1998)). "[F]or purposes of a First Amendment retaliation claim under § 1983, a plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter 'a person of ordinary firmness' from the exercise of First Amendment rights." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005) (quoting *Washington v. Cnty. of Rockland*, 373 F.3d 310, 320 (2d Cir. 2004)). Once a plaintiff pleads that they have suffered adverse action, under the *McVey* test, the Court must first determine "whether the public employee was speaking as a citizen upon a matter of public concern or as an employee about a matter of personal interest." *McVey*, 157 F.3d at 277. This prong is "divided into two inquiries: whether the speech was made as a citizen or pursuant to the employee's duties, and whether the content of the speech addressed 'a matter of interest to the community' rather than 'complaints over internal office affairs.'" *Crouse v. Town of Moncks Corner*, 848 F.3d 576, 583 (4th Cir. 2017) (first citing

*Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006); then quoting *Connick v. Myers*, 461 U.S. 138, 149 (1983)). Second, the Court asks "whether the employee's interest in speaking upon the matter of public concern outweighed the government's interest in providing effective and efficient services to the public." *McVey*, 157 F.3d at 277. Finally, the Court determines "whether the employee's speech was a substantial factor in the employee's [adverse action.]" *Id.* at 277–278. The first two prongs are questions of law, while the third prong is a question of fact. *Crouse*, 848 F.3d at 583.

Both BPD and Morton argue that Plaintiff has not adequately alleged any adverse action taken against her, nor that she was speaking as a citizen, nor on a matter of public concern, nor that her interest in speech outweighed the government's interests, nor that there was a causal link between Plaintiff's speech and any retaliation Plaintiff experienced. *See* ECF 24-1, at 5–8 (BPD's motion to dismiss); ECF 43-1, at 9–13 (Morton's motion to dismiss). As to the alleged adverse action itself, Plaintiff pleads that she suffered retaliatory action in the form of Morton and Laws "orchestrat[ing] a campaign of harassment, bogus internal charges, and intimidation in direct response to Plaintiff's protected reports of misconduct." ECF 1, at 16 ¶ 43. Plaintiff claims that each of these actions was "intended to punish Plaintiff for speaking out and to deter her (and others) from further speech." *Id.* Assuming arguendo that Plaintiff has adequately alleged an adverse action taken against her, the Court turns to the *McVey* elements, breaking the first prong into the two inquiries as described above.

1. <u>Speaking as a Citizen</u>

The basis for Plaintiff's claim that she "engaged in protective speech and expressive conduct on matters of public concern" is her reports of internal police misconduct and her filing of an official complaint against Morton for abuse of authority. ECF 1, at 16 ¶ 42.

"[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Hamilton v. Mayor & City Council of Balt.*, 807 F. Supp. 2d 331, 348 (D. Md. 2011) (quoting *Garcetti*, 547 U.S. at 422). To determine "whether the employee spoke as an employee or as a citizen . . . [the Court engages] in a 'practical' inquiry into the employee's 'daily professional activities' to discern whether the speech at issue occurred in the normal course of those ordinary duties." *Hunter v. Town of Mocksville, N.C.*, 789 F.3d 389, 397 (4th Cir. 2015) (quoting *Garcetti*, 547 U.S. at 422). The "critical question . . . is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane v. Franks*, 573 U.S. 228, 240 (2014).

Morton argues that Plaintiff did not speak as a citizen, but rather as an employee, because she was required as a BPD member to report misconduct, and did so using "internal departmental channels" rather than any channels outside of BPD. ECF 43-1, at 10. Morton points to Rule 9.2 of BPD Policy 302, at 11 ("Rule 9.2"), which requires BPD members "to report any acts of misconduct by a member including, but not limited to discrimination, harassment, criminal conduct, misuse of or excessive force, corruption or misappropriation of property, dishonesty, or any other misconduct or activity detrimental to the operation of the Department, in accordance with established procedures."[6] *See id.* Similarly, BPD argues that "reporting a fellow BPD

[6] Rule 9.2 is available at https://perma.cc/28N7-YA45 (last accessed November 3, 2026). Plaintiff does not challenge this rule's authenticity. *See* ECF 44, at 8–9; *see also Hamilton*, 807 F. Supp. 2d, at 350 (analyzing Rule 9.2 as "submitted by defendants and unchallenged as to authenticity by plaintiff"). The Court thus takes judicial notice of Rule 9.2. *See Crystal v. Batts*, Civ. No. JKB-14-3839, 2015 WL 5698534, at *2 (D. Md. Sep. 25, 2015) ("A federal court may, pursuant to Federal Rule of Evidence 201(b), take judicial notice of the rules and regulations duly promulgated by the Police Commissioner and published for use in the normal course of business of the Baltimore Police Department." (quoting *Driebel v. City of Milwaukee*, 298 F.3d 622, 630 n.2 (7th Cir. 2002))).

member to PIB for misconduct is not First Amendment activity" and that Maddox merely reported Morton "for personal harassment and for abusing her position as a PIB investigator," a "personnel complaint . . . [that] arose from a personal conflict and did not have ramifications outside of that personal conflict." ECF 24-1, at 6–7. In response, Plaintiff argues that "[r]eporting a detective's systematic abuse of PIB database access—a detective Maddox had no personal or professional relationship with, and who worked in an entirely different unit—is not ordinarily within the scope of a patrol officer's daily duties." ECF 44, at 8–9.

Plaintiff points to *Hunter v. Town of Mocksville*, 789 F.3d 389, 399–400 (4th Cir. 2015) for the proposition that Plaintiff's reports of misconduct were not part of her job duties. *See* ECF 44, at 8. But *Hunter*, in fact, supports Defendants' argument. In *Hunter*, three former employees of the Mocksville Police Department brought suit for First Amendment retaliation after they were terminated following their outreach "as concerned citizens to the North Carolina Governor's Office about corruption and misconduct at the Mocksville PD." *Hunter*, 789 F.3d at 393. The Fourth Circuit held that "privately reaching out to the Governor's Office about suspected corruption and misconduct at the Mocksville PD, at the hands of the chief of police, cannot fairly or accurately be portrayed as simply part of Plaintiffs' 'daily professional activities.'" *Id.* (quoting *Garcetti*, 547 U.S. at 422). Critically, the Court noted, "[n]othing before us suggests that Plaintiffs' 'daily professional activities' included calling the Governor's Office for any purpose, much less to express concerns about the Mocksville PD." *Id.* at 399 (citing *Garcetti*, 547 U.S. at 422). In contrast, Plaintiff did not reach out to an entity external to the BPD; instead, as alleged, she used the "official channels" and an internal reporting mechanism by filling a "formal, written complaint with PIB" alleging misconduct by another officer. *See* ECF 1, at 10 ¶ 21. Plaintiff's argument that this case is more like *Hunter* because Plaintiff and Morton were in different units and did not

know each other, ECF 44, at 8, is unavailing. Unlike in *Hunter*, where nothing suggested a duty by the officers to report anything to the governor's office, here there *is* a BPD rule establishing a duty to internally report harassment and other misconduct, *see* Rule 9.2—and as alleged, that is exactly what Plaintiff did, *see* ECF 1, at 10 ¶ 21. Additionally, unlike in *Hunter*, where the plaintiffs reported "corruption and misconduct" at a department level led by the Mockvsille chief of police, 789 F.3d at 393, here, Plaintiff's report concerned one individual's alleged abuse of their role to harass her, ECF 1, at 10 ¶ 21.

Other cases in this district similarly indicate that Plaintiff was speaking as an employee, rather than a citizen. In *Hamilton*, a BPD police officer brought suit after being disciplined following her filing of a written internal complaint with BPD's Internal Affairs Division that documented falsified overtime sheets by other officers in her unit. 807 F. Supp. 2d at 338. Judge Hollander found that the plaintiff was speaking as an employee because under Rule 9.2, the "plaintiff was 'required' to 'report' the misconduct of her fellow officers, 'in accordance with established procedures.'" *Id.* at 350 (quoting Rule 9.2). Plaintiff attempts to distinguish *Hamilton* by arguing that unlike the *Hamilton* plaintiff's report of "conditions of employment that fell squarely within the employee's chain-of-command responsibilities," Plaintiff reported "conduct that implicates the integrity of the internal affairs process itself, not a routine employment dispute." ECF 44, at 9. But Plaintiff does not cite authority for why this distinction is dispositive, nor does she ultimately contend with Plaintiff's duty under Rule 9.2 to report misconduct and harassment internally.

Analyzing *Hamilton*, Chief Judge Russell drove this point home in *Phillips* by distinguishing between whether a plaintiff speaks through an internal process or to external sources. 2026 WL 220991, at *6. While holding that a former BPD officer spoke as an employee

when reporting internally and "within the chain of command," the court held that the plaintiff spoke as a private citizen when reporting *outside* of BPD to entities including the Baltimore City Office of the Inspector General, Baltimore Mayor Brandon Scott, and the Baltimore Sun—each of which "[went] outside the chain of command within the BPD and thus were not made according to [the plaintiff's] official duties." *Id.* Here, once again, Plaintiff has only alleged that she filed an internal report of misconduct through "official channels," as opposed to going outside the chain of command where she would be speaking as a private citizen. *See* ECF 1, at 10 ¶ 21.

Plaintiff attempts to stretch her private, internal, official complaint into a public one by pointing to the BPD Consent Decree, arguing that her "report was made within a court-supervised accountability regime designed to push misconduct information beyond PIB and BPD and into review by [the Department of Justice], the Monitoring Team, the Court, and the public." ECF 44, at 9. Consequently, Plaintiff argues, her "report was not mere internal shop talk—it was speech by a citizen on a matter of obvious public concern, with every reason to expect the subject matter would enter a broader, publicly reportable process." *Id.* at 10. Plaintiff does not provide any authority to suggest that awareness that an internal complaint could eventually be reported pursuant to a Consent Decree alters the above analysis. *See* ECF 44, at 9–10. And perhaps more importantly, while the complaint mentions the Consent Decree as context for BPD's alleged culture of retaliation, *see* ECF 1, at 5–6 ¶¶ 12–13, Plaintiff does not actually plead that she lodged the complaint with the knowledge or intent that it would be made public, *see id.* at 10 ¶ 21, at 16–18 ¶¶ 41–50.

Accordingly, Plaintiff has failed to plead that she spoke as a citizen, rather than an employee, and she cannot state a claim for First Amendment retaliation. Even still, the Court considers other prongs of the analysis.

2. <u>On a Matter of Public Concern</u>

Plaintiff has also failed to establish that she spoke on a matter of public concern by "reporting internal police misconduct and filling an official complaint against Detective Morton for abuse of authority." *See* ECF 1, at 16 ¶ 42. "An employee's speech involves a matter of public concern if it addresses 'an issue of social, political, or other interest to a community.'" *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 316 (4th Cir. 2006) (quoting *Urofsky v. Gilmore*, 216 F.3d 401, 406–07 (4th Cir. 2000) (en banc)). Whether speech relates to a matter of public concern turns on "the content, form, and context . . . as revealed by the whole record." *Connick*, 461 U.S. at 147–48, 148 n.7. "The forum in which a petition is lodged will be relevant to the determination [of] whether the petition relates to a matter of public concern." *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 398 (2011). "A petition filed with an employer using an internal grievance procedure in many cases will not seek to communicate to the public or to advance a political or social point of view beyond the employment context." *Id.* Additionally, "[p]ersonal grievances, complaints about conditions of employment, or expressions about other matters of personal interest do not constitute speech about matters of public concern that are protected by the First Amendment." *Stroman v. Colleton Cnty. Sch. Dist.*, 981 F.2d 152, 156 (4th Cir. 1992). And while "the public may always be interested in how government officers are performing their duties . . . that will not always suffice to show a matter of public concern." *Hamilton*, 807 F. Supp. 2d at 349 (quoting *Guarnieri*, 564 U.S. at 399).

While Plaintiff unquestionably alleges concerning misconduct by a fellow BPD employee, Plaintiff ultimately filed a complaint through official, internal reporting channels alleging misuse of BPD information systems for the purposes of interpersonal harassment. Plaintiff points to *Durham v. Jones*, 737 F.3d 291, 302 (4th Cir. 2013), for the proposition that "speech concerning

'serious governmental misconduct, and certainly not least of all serious misconduct in a law enforcement agency,' occupies the core of protected public speech." ECF 44, at 10 (quoting *Durham*, 737 F.3d at 302). But *Durham* actually confirms that Plaintiff did not speak on a matter of public concern. In *Durham*, a former police officer was demoted and suspended after he filed an internal grievance with his supervisors. 737 F.3d at 298. After learning that "the grievance would be investigated by the very officials" against whom he originally filed the complaint, the plaintiff "prepared a cover letter to a set of documents" regarding his grievance and sent the packet to the state's attorney for his county, the governor, the police academy where he trained, the state's police commission, the state police, and various media outlets. *Id.* at 297–98. In affirming the district court's finding that the plaintiff had spoken on a matter of public concern, the Fourth Circuit explicitly distinguished between the plaintiff's *internal* grievance and his subsequent *public* reporting. *Id.* at 300 ("Durham is not claiming First Amendment protection for the materials he filed in the internal grievance proceedings . . . or for his filing of an internal grievance. Rather, Durham is claiming First Amendment protection for his publicizing of those materials[.]"). In contrast, Plaintiff makes no allegation that she took any steps to publicize her internal affairs complaint—the core action justifying the *Durham* court's holding that the plaintiff had spoken on a matter of public concern.

Plaintiff also cites *Hunter*, 789 F.3d at 396, for the proposition that "[p]ublic employees are often 'in the best position to know what ails the agencies for which they work,' and the public has a substantial interest in receiving their informed views concerning official wrongdoing." ECF 44, at 10 (quoting *Hunter*, 789 F.3d at 396); *see also* ECF 26, at 8 (arguing "the content of the complaint, not the employment of the complainant, is what is determinative when considering whether the complaint concerned a matter of public concern"). But as discussed above, in *Hunter*

the plaintiffs alleging First Amendment retaliation had reached out "as concerned citizens to the North Carolina Governor's Office about corruption and misconduct at the Mocksville PD." *Hunter*, 789 F.3d at 393. Here, there is no such allegation that Plaintiff reached beyond the BPD or otherwise brought her concerns to the attention of a body outside of the BPD.[7]

3. <u>Causal Effect</u>

Though it is not necessary to reach the second and third elements of the *McVey* test, the Court notes that even if Plaintiff had established the first two elements, her case likely fails on causation as well given that the retaliation she describes began *before* she filed her complaint. "The requirement of causation is "'rigorous' in that the protected expression must have been the 'but for' cause of the adverse employment action alleged." *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 318 (4th Cir. 2006).

Plaintiff identifies the retaliation as "Detective Morton and Ms. Laws—individually and in concert—orchestr[ating] a campaign of harassment, bogus internal charges, and intimidation in direct response to Plaintiff's protected reports of misconduct." ECF 1, at 16 ¶ 43. Plaintiff alleges that the "timing and nature of the harassment (which escalated immediately after Plaintiff complained about Morton) demonstrate a causal link." *Id.* at 17 ¶ 44. Plaintiff also alleges that "[a]fter Plaintiff filed her complaint against Morton in March 2024, the harassment from Laws intensified—and simultaneously, PIB redoubled its investigative scrutiny of Plaintiff stemming

---

[7] Plaintiff also rehashes her argument discussed in the previous section regarding the context of her complaint within the Consent Decree. *See* ECF 26, at 10 (noting the complaint "was made within a court-supervised accountability regime specifically designed to push misconduct information beyond PIB and BPD and into review by DOJ, the Monitoring Team, the Court, and the public"). But as explained above, even assuming arguendo that a plaintiff's knowledge that her complaint would later be made public in some form by the body tasked with accepting complaints constitutes speaking on a matter of public concern, Plaintiff does not actually plead that she lodged the complaint with the knowledge or intent that it would be made public, *see* ECF 1, at 10 ¶ 21, at 16–18 ¶¶ 41–50.

from the complaints." *Id.* at 11 ¶ 25. But according to Plaintiff's own allegations, both forms of alleged retaliation were already substantially unfolding *before* she filed her complaint against Morton. *See* ECF 1, at 6 ¶ 14 (describing "orchestrated harassment and retaliation campaign" as beginning in April 2023, long before Plaintiff's March 2024 complaint); *see also id.* at 7 ¶ 15 (describing how, in response to anonymous complaints filed prior to March 2024, BPD "dragged out the investigation of [Law's anonymous] complaint beyond any reasonable length, even though the allegation was meritless"). Given that the retaliatory behavior of which Plaintiff complains was already occurring before she filed her complaint, Plaintiff's allegations, taken as true, do not support a finding that her complaint was the but-for cause of any retaliatory actions.

Because Plaintiff has not pleaded facts that would establish her First Amendment retaliation claim, Count I will be dismissed.

**B. Fourteenth Amendment Equal Protection Clause (Count II)**

In Count II, Plaintiff alleges that Defendants violated the Fourteenth Amendment's Due Process Clause by "intentionally treat[ing] Plaintiff Maddox differently from other similarly situated individuals, in a manner that was arbitrary, vindictive, and lacked any legitimate governmental purpose." ECF 1, at 19 ¶ 53. Specifically, Plaintiff points to the "glowing disparity" in the investigation she faced for anonymous complaints and the investigation Morton faced for Plaintiff's complaint. *Id.* Plaintiff alleges that BPD "rigorously enforce[d] internal rules against Plaintiff (who *did not* violate any rules) while flagrantly ignoring and then excusing the violations actually committed by Morton." *Id.* ¶ 54 (emphasis in original).[8] Plaintiff alleges that this

[8] Though Plaintiff alleges that BPD ignored and excused Morton's violation, the complaint, at least in part, contradicts this assertion by stating that Morton eventually resigned "with a penalty" following an informal BPD process initiated in response to Maddox's complaint. ECF 1, at 11 ¶ 24.

disparity was "driven in part by her membership in a disfavored 'class'—namely, BPD officers who report misconduct." *Id.* ¶ 55. In response to Morton's motion to dismiss, however, Plaintiff acknowledges that "[t]o the extent Count II is predicated solely on a retaliation theory, the weight of Fourth Circuit precedent presents a significant obstacle." ECF 44, at 13. Indeed, "[n]either [the Fourth Circuit] nor the Supreme Court has recognized an equal protection right to be free from retaliation." *Wilcox v. Lyons*, 970 F.3d 452, 458 (4th Cir. 2020). To the extent Count II alleges that Defendants retaliated against Maddox in violation of the Fourteenth Amendment, it must be dismissed.

Plaintiff pivots to the complaint's allegation that "Morton used her state-given powers to target Maddox for disparate treatment—facilitating a harassment campaign against Maddox while other similarly situated officers were not subject to the same conduct." ECF 44, at 13 (citing ECF 1, at 19–20 ¶¶ 54–56). "To succeed on an equal protection claim, a plaintiff must first demonstrate that [s]he has been treated differently from others with whom [s]he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). "Once this showing is made, the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny." *Id.*

Even assuming arguendo that Morton's treatment of Plaintiff could be the basis for Plaintiff's disparate treatment claim, Plaintiff has failed to allege any specific facts regarding Morton's treatment of other similarly situated BPD officers. *See* ECF 1, at 20 ¶ 56. Further, while the complaint alleges that Defendants discriminated against Plaintiff for her "membership in a disfavored 'class'" of BPD officers who report misconduct, *id.* at 19 ¶ 55, Plaintiff's own

allegations show that the negative treatment of which she complains began long before she filed a complaint, *see id.* at 6 ¶ 14, at 7 ¶ 15.

Given Plaintiff's concession that she cannot bring a retaliation claim under the Fourteenth Amendment and the lack of facts alleged to establish an equal protection claim with respect to Morton, Count II will be dismissed.[9]

### C. Fourteenth Amendment Due Process Clause (Count III)

In Count III, Plaintiff alleges that Defendants violated her rights under the Fourteenth Amendment's Due Process Clause in three ways. First, Morton allegedly violated Plaintiff's "reasonable expectation of privacy in her personal information and in the confidentiality of her internal affairs file." ECF 1, at 21 ¶ 62. Second, Plaintiff brings a stigma-plus claim, contending that Defendants deprived her of her "liberty interest in [her] good name and integrity." *Id.* at 22 ¶ 63. Finally, Plaintiff brings a substantive due process claim, alleging that Morton's misuse of PIB powers combined with "BPD leadership's knowing tolerance of the ongoing harassment" of Plaintiff "was so outrageous and harmful that it violated Plaintiff's substantive due process rights." ECF 1, at 22 ¶ 64.

In response to Morton's motion to dismiss, Plaintiff retreats from her stigma-plus claim, acknowledging that "the stigma-plus doctrine requires a tangible change in employment status as traditionally formulated" while noting that "Plaintiff's due process claim is not limited to the stigma-plus theory" and that the informational privacy violation and substantive due process claim

[9] In Plaintiff's response to Morton's motion to dismiss, Plaintiff alleges for the first time that Count II may also be viable under a traditional equal protection analysis because Maddox is an African American woman. ECF 44, at 13. "It is well-established that parties cannot amend their complaints through briefing or oral advocacy." *S. Walk at Broadlands Homeowner's Ass'n v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013). Perhaps in recognition of this fact, Plaintiff "requests that this claim be preserved and, should the Court find any deficiency, that leave to amend be granted." ECF 44, at 13.

are the "primary basis for Count III." ECF 44, at 16. Consequently, the Court considers whether Plaintiff has stated a claim on either the informational privacy or substantive due process claims.

1. Informational Privacy Violation

"Procedural due process applies only to the deprivation of liberty and property interests that the Fourteenth Amendment encompasses." *Rockville Cars, LLC v. City of Rockville, Md.*, 891 F.3d 141, 145 (4th Cir. 2018) (citing *Bd. of Regents v. Roth*, 408 U.S. 564, 569 (1972)). For claims alleging a violation of the constitutional right to privacy under the Fourteenth Amendment, the Fourth Circuit follows a two-pronged test: first, the court asks whether the information sought is entitled to privacy protection, and second, whether a compelling governmental interest in disclosure outweighs the individual's privacy interest. *Payne v. Taslimi*, 998 F.3d 648, 655 (4th Cir. 2021).

Plaintiff alleges that Morton "was only authorized to access [Plaintiff's] records for bona fide investigation reasons; [but] by accessing them for personal retaliation, she *exceeded* her authorization and violated Plaintiff's constitutional right to privacy in those records." ECF 1, at 21 ¶ 62 (emphasis in original). On this count, the core dispute between Plaintiff and Morton is whether Plaintiff had a constitutionally protected interest in the privacy of her internal affairs files. *Compare* ECF 43-1, at 15–16, *with* ECF 44, at 14–15.

The Fourth Circuit has held that the "constitutional right to privacy extends to . . . the individual interest in avoiding disclosure of personal matters." *Payne v. Taslimi*, 998 F.3d 648, 655 (4th Cir. 2021) (quotations omitted). However, "that 'right to privacy' protect[s] 'only information with respect to which the individual has a reasonable expectation of privacy.'" *Id.* (quoting *Walls v. City of Petersburg*, 895 F.2d 188, 193 (4th Cir. 1990)). Notably, the test focuses on "whether [the] *information* is protected by a constitutional right to privacy," *id.* at 656

(emphasis added), not whether such a right exists with respect to the records from which that information was drawn. There is no reasonable expectation of privacy in information that is freely available in publicly held records. *Id.* at 655.

While the Court agrees with Plaintiff on the second prong of the *Payne* test that, as alleged, "Morton's conduct had no governmental justification whatsoever," ECF 44, at 15, it cannot conclude that Plaintiff had a constitutional privacy interest in the information that Morton allegedly disclosed: her name and rank, her phone number and mailing address, her husband's phone number, and the "specific dates and times when Plaintiff was scheduled to appear for internal PIB interviews concerning the anonymous complaints of infidelity." ECF 1, at 8 ¶¶ 17–18. As to names, numbers, and addresses, the Fourth Circuit has held there is no constitutional privacy interest in such information. *See Condo v. Reno*, 155 F.3d 453 (4th Cir. 1998) (nothing that neither the Supreme Court nor the Fourth Circuit has recognized a "Fourteenth Amendment right to privacy in . . . names, addresses, and phone numbers"), *rev'd sub nom. on other grounds*, *Reno v. Condon*, 528 U.S. 141, 148 (2000).

As for information regarding Plaintiff's internal affairs investigations, Plaintiff points to *Montgomery Cnty. Md. v. Shropshire*, 23 A.3d 205, 218 (Md. 2011), a case in which the Maryland Supreme Court held that records of internal investigations were personnel records under Maryland's Public Information Act, Md. Code, State Gov't § 10-616 and thus were mandatorily exempt from disclosure.[10] However, as Morton points out in reply, ECF 45, at 7, the Maryland legislature amended its Public Information Act in 2021, adding statutory language that "a record

[10] At the time, the relevant code section analyzed by the Maryland Supreme Cout was Md. Code, State Gov't § 10-616. *See Shropshire*, 23 A.3d at 218. In 2014, that code section was reorganized into Md. Code Gen. Provis. § 4 et seq. *See* 2014 Md. Laws Ch. 94 (H.B. 270); *see also* Md. Gen. Provis. § 4-311 (Revisor's Notes stating that this section was formerly Md. State Gov't § 10-616).

relating to an administrative or criminal investigation of misconduct by a police officer, *including an internal affairs investigatory record*, a hearing record, and records relating to a disciplinary decision, is not a personnel record for purposes of this section." Md. Code Gen. Provis. § 4-311(c)(1) (effective Oct. 1, 2021) (emphasis added); *see also Lomax v. State*, 298 A.3d 937, 962 (Md. 2023) (noting that "as of October 1, 2021, [internal affairs] records in general are no longer classified as 'personnel records' under the [Public Information Act]"); *Balt. Action Legal Team v. Off. Of State's Att'y of Balt. City*, 265 A.3d 1187, 1201 n.12 (Md. App. 2021) (noting that following the 2021 amendment, investigatory records are now "subject to discretionary withholding" and that "a custodian *may* deny inspection if disclosure would be 'contrary to the public interest'" (emphasis added)).[11] Consequently, Plaintiff's reliance on *Montgomery County* for the proposition that she had a reasonable expectation of privacy in her internal affairs records is misplaced.[12]

Similarly, the Supreme Court has cautioned that "[b]ecause the Due Process Clause 'does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society,' [the Court has] previously rejected claims that the

[11] The Maryland legislature amended this code section again, effective October 1, 2024, but the effect of the statutory language is the same, clarifying that "a record relating to an administrative or criminal investigation of misconduct by a police officer, including an internal affairs investigatory record" as well as "records relating to a disciplinary decision" are not personnel records exempt from disclosure. *See* Md. Code Gen. Provis. § 4-311(c)(1) (effective October 1, 2024).

[12] Though Plaintiff does not mention the PIB Manual in her information privacy argument, *see* ECF 44, at 14–15, the complaint alleges that the PIB Manual "explicitly prohibits PIB personnel from disclosing or confirming to anyone outside of PIB that a complaint has been made, that an investigation is underway, or the identities of complainants, witnesses, or accused." ECF 1, at 5–6 ¶ 12. Even still, the violation of a "state-created rule regulating the deprivation of a property interest" does not necessarily violate the Due Process Clause given the "well recognized need for flexibility in the application of due process doctrine." *Riccio v. Cnty. of Fairfax, Va.*, 907 F.2d 1459, 1469 (4th Cir. 1990) (citation omitted).

Due Process Clause should be interpreted to impose federal duties that are analogous to those traditionally imposed by state tort law." *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 128 (1992) (quoting *Daniels v. Williams*, 474 U.S. 327, 332 (1992)). Accordingly, other circuits have declined to recognize constitutional invasions of privacy when a plaintiff presents allegations that are "squarely within the ambit of state tort law protections." *See Davis v. Butcher*, 853 F.2d 718, 719 (9th Cir. 1988); *see also Carroll v. Parks*, 755 F.2d 1455, 1456 (11th Cir. 1985) (affirming the district court's conclusion that any plausible claim would arise in tort and not under privacy rights protected by the Constitution); *Zaffuto v. City of Hammond*, 308 F.3d 485, 491 (5th Cir. 2002) ("Federal cases limiting the scope of the confidentiality branch suggest that the proper remedy for less serious privacy violations is state tort law.").

Finally, Fourth Circuit cases on informational privacy violations suggest that Plaintiff's claim is not one that is typically cognizable as a Fourteenth Amendment informational privacy violation. Informational privacy violation cases typically concern governmental collection or disclosure of private personal information, often at a statutory or policy level—not allegations that one public employee misused (even if egregiously) a database to provide another employee's personal information to a private individual. Indeed, the Fourth Circuit articulated the informational privacy violation balancing test in *Walls v. City of Petersburg*, in which a plaintiff challenged a city's policy requiring her to fill out an allegedly invasive background questionnaire after being terminated for refusing to do so. 895 F.2d 188, 190 (4th Cir. 1990). In upholding the policy, the Fourth Circuit found that even where the plaintiff had a reasonable expectation of privacy, the city's compelling interest in the information and caution in protecting it from further disclosure meant it had not violated the plaintiff's right to privacy. *Id.* at 195; *see also Greenville Women's Clinic v. Comm'r, S.C. Dep't of Health & Env't Control*, 317 F.3d 357, 361 (4th Cir.

2002) (reviewing a challenge to a South Carolina law authorizing state inspectors to access abortion clinic's patient records); *Senior Execs. Ass'n v. United States*, Civ. No. AW-12-2297, 2013 WL 1316333, at *1 (D. Md. Mar. 27, 2013) (challenging federal law requiring senior executive branch officials to disclose financial information); *but see Payne*, 998 F.3d at 658–59 (holding incarcerated person did not have reasonable expectation of privacy in information about his HIV status after a prison physician disclosed that information to others in the prison).

In the absence of other authority to suggest that there is a constitutional privacy interest in police internal affairs records that under Maryland law are generally disclosable to the public, and because Plaintiff's complaint demonstrates that the alleged violations also arise under Maryland tort law, the Court cannot find that Plaintiff has alleged an informational privacy violation under the Fourteenth Amendment.

2. <u>Substantive Due Process Violation</u>

"Substantive due process is a substantially narrower concept than procedural due process, for it serves as 'an absolute check on certain governmental actions *notwithstanding* the fairness of the procedures' used to implement those actions." *Front Royal & Warren Cnty. Indus. Park Corp. v. Town of Front Royal*, 135 F.3d 275, 287–99 (4th Cir. 1998) (quoting *Love v. Pepersack*, 47 F.3d 120, 122 (4th Cir.), *cert. denied*, 516 U.S. 813 (1995)) (emphasis in *Front Royal*). "The touchstone of due process is protection of the individual against arbitrary action of government." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998). "'Arbitrary action,' however, is used in a constitutional sense, which encompasses 'only the most egregious official conduct,' namely that which 'shocks the conscience.'" *Slaughter v. Mayor & City Council of Balt.*, 682 F.3d 317, 321 (4th Cir. 2012) (quoting *Lewis*, 523 U.S. at 846).

Plaintiff does not cite any authority for the proposition that a BPD employee intentionally and wrongfully accessing the PIB database to give information to another individual for the purposes of harassment rises to the level of "the most egregious official conduct" that "shocks the conscience." *See Slaughter*, 682 F.3d at 321 (quoting *Lewis*, 523 U.S. at 846). While Plaintiff certainly alleges deeply harmful behavior, even severe harassment of a coworker does not automatically take on a constitutional dimension. Indeed, "the Supreme Court has made clear that 'the Due Process Clause of the Fourteenth Amendment . . . does not transform every tort committed by a state actor into a constitutional violation.'" *Lilly v. Balt. City Police Dep't*, Civ. No. BAH-22-2752, 2025 WL 1709856, at *15 (D. Md. June 17, 2025) (quoting *DeShaney v. Winnebago Cnty. Dep't of Social Servs.*, 489 U.S. 189, 202 (1989)); *see also Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 848 (1998) ("[T]he due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm."); *Evans v. Chalmers*, 703 F.3d 636, 646 n.2 (4th Cir. 2012) (explaining that the "Due Process Clause does not constitute a catch-all provision that provides a remedy whenever a state actor causes harm"). Instead, to adequately plead a substantive due process violation, a plaintiff must allege that they were deprived of their interest in a way that is "so far beyond the outer limits of legitimate governmental action that *no process* could cure the deficiency." *Sylvia Dev. Corp. v. Calvert Cnty., Md.*, 48 F.3d 810, 827 (4th Cir. 1995) (emphasis in original). "The protection of substantive due process is indeed narrow and covers only state action which is 'so arbitrary and irrational, so unjustified by any circumstance or governmental interest, as to be literally incapable of avoidance by any pre-deprivation procedural protections or of adequate rectification by any post-deprivation state remedies.'" *Id.* (quoting *Rucker v. Harford County*, 946 F.2d 278, 281 (4th Cir. 1991), *cert. denied*, 502 U.S. 1097 (1992)).

In *Rodman v. Md. Dep't of Human Resources*, Judge Bredar found that a plaintiff who alleged that the defendant "intentionally misrepresented facts about Plaintiff's eligibility for the benefits she sought and terminated Plaintiff's benefits as punishment for contacting [the defendant's] supervisors" had not stated a claim because the actions were not beyond the bounds of legitimate government action such that no process could cure the deficiency—as evidenced by the Plaintiff's own allegations "that Plaintiff ha[d] repeatedly prevailed in appeals of the decisions to terminate her benefits." Civ. No. JKB-12-3218, 2013 WL 2325139, at *5 (D. Md. May 24, 2013); *see also Frapple, L.P. v. Comm'rs of Town of Rising Sun*, Civ. No. WDQ-10-0018, 2012 WL 835604, at *6–7 (D. Md. Mar. 8, 2012) (dismissing substantive due process claim when plaintiff did not allege that no process could cure its injury). Similarly, here, Plaintiff's allegations show that there was a mechanism through which she could, and did, file a complaint against Morton, and that following her complaint, BPD conducted some level of inquiry into the complaint that resulted in Morton resigning "with a penalty[.]'" ECF 1, at 10–11 ¶¶ 21–24. Just as in *Rodman*, then, a process following the alleged violations did ultimately cure the violation in the sense that Morton's access to and misuse of the database—which is the basis of the alleged violation—was terminated. *See id.*

Additionally, "[w]here a claim sounds both in state tort law and substantive due process, state tort law is the rule and due process the distinct exception . . . [T]he Supreme Court has established a strong presumption that § 1983 due process claims which overlap state tort law should be rejected and the case, if diversity is lacking, sent to state court." *Waybright v. Frederick Cnty.*, 528 F.3d 199, 205 (4th Cir. 2008). Here, Plaintiff has brought state law claims regarding the same conduct, *see, e.g.*, ECF 1, at 35–36 ¶¶ 111–26 (Counts IX and X for invasion of privacy and intentional infliction of emotional distress), and has not provided authority to suggest that a

BPD employee who is not alleged to be in leadership accessing an internal affairs database to facilitate interpersonal harassment of another BPD employee rises to the level of substantive due process violation envisioned under the Fourteenth Amendment. Consequently, Count III will be dismissed.

**D. Civil Conspiracy to Violate Civil Rights (Count IV)**

Plaintiff's final federal claim alleges that Morton and Laws "knowingly conspired together for the purposes of depriving Plaintiff of the equal protection of the laws and of her rights and privileges under the Constitution." ECF 1, at 24 ¶ 70.

To state a claim for civil conspiracy to violate civil rights, a plaintiff must allege facts to satisfy the following elements: "(1) A conspiracy of two or more persons, (2) who are motivated by a specific class-based, invidiously discriminatory animus, to (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all, (4) and which results in injury to the plaintiff as (5) a consequence of an overt act committed by the defendants in connection with the conspiracy." *Buschi v. Kirven*, 775 F.2d 1240, 1257 (4th Cir. 1985) (citing *United Bhd. of Carpenters v. Scott*, 463 U.S. 825, 828–29 (1983)). The Fourth Circuit has clarified that as to the second element, "the class protected can extend no further than to those classes of persons who are, so far as the enforcement of their rights is concerned, 'in unprotected circumstances similar to those of the victims of Klan violence.'" *Id.* (quoting *Scott*, 463 U.S. at 851).

Specifically, the Fourth Circuit has held that "whistleblowers" do *not* qualify as a class entitled to the benefits of 42 U.S.C. § 1985(3). *Id.* at 1258. In her motion to dismiss, Morton raised *Buschi*'s holding regarding whistleblowers, ECF 43-1, at 18, and Plaintiff effectively

concedes that she has not stated a claim insofar as she alleges conspiracy on the basis of having filed a complaint, ECF 44, at 17.[13] Consequently, Count IV will also be dismissed.[14]

**E. Remaining State Law Claims**

All remaining claims arise under the Maryland Constitution and Maryland state law, and there is no independent basis for federal jurisdiction. Under 28 U.S.C. § 1367(c)(3), "district courts may decline to exercise supplemental jurisdiction over a claim . . . [where] the district court has dismissed all claims over which it has original jurisdiction[.]" "A court has 'wide latitude in determining whether or not to retain jurisdiction over state claims when all federal claims have been extinguished.'" *Henderson v. Harmon*, 102 F.4th 242, 251 (4th Cir. 2024) (quoting *Shanaghan v. Cahill*, 58 F.3d 106, 110 (4th Cir. 1995)). "That said, '[g]enerally, when a district court dismisses all federal claims in the early stages of litigation' . . . 'it should decline to exercise jurisdiction over any remaining pendent state law claims by dismissing those claims without prejudice.'" *Id.* (quoting *Banks v. Gore*, 738 F. App'x 766, 773 (4th Cir. 2018)). Notably, the Supreme Court has stated that while it is not a "mandatory rule to be applied inflexibly in all cases . . . in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience,

[13] Similar to Plaintiff's response regarding Count II, ECF 44, at 13, Plaintiff argues that the complaint "does not depend solely on a whistleblower class theory" because "the nature and the content of the [alleged] harassment . . . may, upon discovery, reveal racial or gender-based animus motivating the conspirators' conduct." *Id.* at 17. Consequently, Plaintiff asks that, "should the Court find the current allegations insufficient, that leave to amend be granted to plead additional facts concerning class-based discriminatory animus." *Id.*

[14] Because the Court finds that Plaintiff has failed to state a claim on each federal claim, it does not reach BPD's arguments regarding *Monell* liability and sovereign immunity, *see* ECF 24-1, at 9–12, nor Morton's argument regarding her susceptibility to suit in her official capacity, *see* ECF 43-1, at 7–8. *See Young v. City of Mount Rainier*, 238 F.3d 567, 579 (4th Cir. 2001) *abrogated on other grounds by Short v. Hartman*, 84 F.4th 593 (4th Cir. 2023) (noting a *Monell* claim cannot exist without an underlying constitutional violation).

fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon University v. Cohill*, 484 U.S. 343, 350 n.7 (1988).

The Court has considered all the relevant factors and concludes that dismissal of the remaining state law claims is appropriate. Aside from the state constitutional questions, this matter also presents nine state law claims, each of which potentially involves complicated issues of state law. Moreover, though the parties understandably wish their case to proceed with haste, the matter has not entered discovery. Thus, "[t]his case is still in its early stages and the remaining claims present potentially complicated questions of state law" and the state court "is better suited to adjudicate [state law] claims." *Marshall v. Town of Bladensburg*, Civ. No. DKC-24-1549, 2025 WL 822936, at *7–8 (D. Md. Mar. 14, 2025) (declining to exercise supplemental jurisdiction over pendant negligence, gross negligence, and Maryland Declaration of Rights claims after the Court dismissed the Fourth and Fourteenth Amendment and *Monell* claims brought under § 1983 and remanding the case to state court). There are no fairness concerns as all remaining claims can be re-alleged in state court. *See* 28 U.S.C.A. § 1367(d) (stating that "[t]he period of limitations for any claim asserted under subsection (a) . . . shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period"). Moreover, permitting the state court to address state law claims does not waste judicial resources, nor does it significantly tax the parties who can simply raise their already well-briefed arguments for and against dismissal in state court. In other words, dismissal without prejudice to refile state law claims in state court "would not be inconvenient, unfair, or wasteful of judicial resources." *Henderson*, 102 F.4th at 252.

### F. Plaintiff's Request for Leave to Amend

In Plaintiff's response to Morton's motion to dismiss, she requests the opportunity to amend her complaint in the event that the Court dismisses Counts II and IV. *See* ECF 44, at 13, at 17. The Court denies this request for two reasons. First, ordinarily, leave to amend must be formally requested by motion. *See Jones v. Glendale Apartment Props. LLC*, Civ. No. DKC-24-3731, 2025 WL 2659875, at *7 (D. Md. Sep. 17, 2025) ("[A] plaintiff's request for 'leave to amend [made] only in a footnote of their response to Defendants' motion to dismiss' does not constitute a proper motion to amend." (quoting *Cozzarelli v. Inspire Pharms. Inc.*, 549 F.3d 618, 630–31 (4th Cir. 2008))). "Until Plaintiff has supplied, or attempted to supply, concrete facts, the court cannot determine whether amendment necessarily would be futile." *Id.* Second, both of Plaintiff's requests to amend her complaint appear to concede that discovery would be needed to reveal whether her intended revised claims are viable. *See* ECF 44, at 13 ("To the extent the evidence developed in discovery reveals that Morton's conduct was motivated in part by racial animus—a factual question that cannot be resolved on the pleadings—Count II would be viable under traditional equal protection analysis."); *id.* at 17 (stating as to Count IV that "[t]he nature and content of the harassment . . . may, upon discovery, reveal racial or gender-based animus motivating the conspirators' conduct"). However, "[t]he discovery rules are designed to assist a party to prove a claim it reasonably believes to be viable without discovery, not to find out if it has any basis for a claim." *Micro Motion, Inc. v. Kane Steel Co.*, 894 F.2d 1318, 1327 (Fed. Cir. 1990). Because Plaintiff appears to concede that she does not have a basis for an amended claim without the benefit of discovery, any amendment would be futile. *See Save Our Sound OBX, Inc. v. N.C. Dep't of Trans.*, 914 F.3d 213, 228 (4th Cir. 2019) (noting a proposed amendment is futile

"if the claim it presents would not survive a motion to dismiss"). Accordingly, the informal request for leave to amend Plaintiff's complaint is denied.

## IV. CONCLUSION

The Court is sympathetic to the harms Plaintiff allegedly suffered, not least of which include ongoing harassment and a severe heart attack. But severe harm alone does not automatically take on a constitutional dimension, nor does it make constitutional law the proper vehicle for redressing that harm.

Accordingly, for the foregoing reasons, Defendant BPD's motion to dismiss, ECF 24, is **GRANTED** as to all federal claims and Defendant Morton's motion to dismiss, ECF 43, is **GRANTED** as to all federal claims. Pursuant to 28 U.S.C. § 1367(c)(3), the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state-law claims (Counts V–XIII) and those claims are **DISMISSED** without prejudice.

A separate implementing order will issue.

/s/

Brendan A. Hurson
United States District Judge